# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 22-50149

BRITTANY HUDSON,

*Plaintiff-Appellant,*

v.

LINCARE, INC.,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS IN CASE NO. 1:20-CV-928
ROBERT PITMAN, U.S. DISTRICT JUDGE

## BRIEF FOR PLAINTIFF-APPELLANT

Holt M. Lackey
Jennifer Jones Despins
ELLWANGER LAW,
L.L.L.P.
8310-1 N. Capital of
Texas Hwy, Suite 190
Austin, Texas 78731
(737) 808-2260
hlackey@equalrights.law
*Attorney for Plaintiff-Appellant,*
*Brittany Hudson*

## **CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons

and entities described in the fourth sentence of Rule 28.2.1 have an interest in the

outcome of this case. These representations are made in order that the judges of this

court may evaluate possible disqualification or recusal.

Holt Lackey

Jennifer Jones Despins

Jay D. Ellwanger

David M. Kalteux

Rachel Z. Ulrich

Brittany Hudson

Lincare Holdings Inc.

The Linde Group


Dated: May 18, 2022                          /s/ Holt M. Lackey
                                             Holt M. Lackey

## STATEMENT REGARDING ORAL ARGUMENT

The issues forming the basis of this lawsuit are important and factually intensive. Plaintiff respectfully suggests that the Court would benefit from hearing counsel explain the details of these important issues in the Fifth Circuit and why the District Court's decision is in contravention of established federal jurisprudence. Tone, attitude, and other information gleaned from having heard the witnesses testify are lost in the facts of the record. Plaintiff believes that further explanation beyond that contained in the written arguments would be beneficial to the Court. Plaintiff seeks a reversal of the trial court based upon the application of the law to the facts in this case, and it is an understanding of the nuances in the facts of this matter that oral argument would benefit.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................ i

STATEMENT REGARDING ORAL ARGUMENT ............................................. ii

TABLE OF CONTENTS ........................................................................................ iii

TABLE OF AUTHORITIES ................................................................................... v

I.     JURISDICTIONAL STATEMENT ................................................................ 1

II.    STATEMENT OF THE ISSUES PRESENTED .............................................. 2

III.   STATEMENT OF THE CASE ........................................................................ 3

     A.   Procedural History ................................................................................ 3

     B. Statement of Facts ................................................................................ 4

IV.    SUMMARY OF THE ARGUMENT ............................................................. 17

V.     ARGUMENT ................................................................................................ 19

     A.   Applicable Legal Standards ................................................................ 19

         1.  This Court's Standard of Review ...................................................... 19

         2.  Plaintiff's Hostile Work Environment Claim under Title VII ......... 20

         3.  Plaintiff's Retaliation Claim under Title VII .................................... 21

     B.   The District Court Erred in Granting Summary Judgment on Plaintiff's Hostile Work Environment Claim .......................................................... 22

         1.  Repeated Racial Slurs are Sufficient to Create Questions of Fact Regarding Plaintiff's Hostile Work Environment Claim ................. 22

2.  The District Erred by Resolving Disputed Questions of Fact Regarding the Alleged Remedial Action in Defendant's Favor.......25

C.  The District Court Erred in Granting Summary Judgment on Plaintiff's Retaliation Claim.....................................................................................30

VI.  CONCLUSION .................................................................................35

# TABLE OF AUTHORITIES

## Cases

*Aryain v. Wal-Mart Stores of Texas LP,*
    534 F.3d 474 (5th Cir.2008) .................................................. 20, 31

*Ayissi-Etoh v. Fannie Mae,*
    712 F.3d 572 (D.C. Cir. 2013) ........................................................23

*Bourger v. Eaton Corp.,*
    114 F.Supp.2d 412 (W.D. N. C. 2000) ..........................................27

*Brandon v. Sage Corp.,*
    808 F.3d 266 (5th Cir. 2015) .........................................................31

*Brown v. E. Miss. Elec. Power Ass'n.,*
    989 F.2d 858 (5th Cir. 1993) ............................................................3

*Burlington Northern and Santa Fe Ry. Co. v. White,*
    548 U.S. 53, 67, 126 S.Ct. 2405 (2006).........................................31

*Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.,*
    482 F.3d 408 (5th Cir. 2007) .........................................................19

*Burton v. Freescale Semiconductor, Inc.,*
    798 F.3d 222 (5th Cir. 2015) ................................................... 29, 34

*Carter v. Cali. Grill, LLC,*
    2021 WL 1960629 (W.D. Tex. 2021)...............................................3

*Carter v. California Grill,*
    538 F.Supp.3d 714 (W.D. Tex. 2021) ...........................................27

*Chambers v. Sears Roebuck and Co.,*
    428 Fed.Appx. 400 (5th Cir. 2011)................................................20

*Chaney v. Dreyfus Serv. Corp.,*
    595 F.3d 219 (5th Cir. 2010) .........................................................20

*Cooper Indus., Ltd. V. Nat'l Union Fire Ins. Co.*,
    876 F.3d 119 (5th Cir. 2017) ..........................................................................19

*Donaldson v. CDB Inc.*,
    335 F3d. Appx. 494 (5th Cir. 2009) .............................................................20

*Fennell v. Marion Indep. Sch. Dist.*,
    804 F.3d 387 (5th Cir. 2005) ..........................................................................23

*Gardner v. CLC of Pascagoula, L.L.C.*,
    915 F.3d 320 (5th Cir. 2019) ..........................................................................21

*Haire v. Bd. of Sup'rs of Louisiana State Univ. Agric. & Mech. Coll.*,
    719 F.3d 356 (5th Cir. 2013) ..........................................................................33

*Hamilton v. Segue Software Inc.*,
    232 F.3d 473 (5th Cir. 2000) ..........................................................................19

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993) ...........................................................................................23

*Harvill v. Westward Comm. L.L.C.*,
    433 F.3d 428 (5th Cir. 2005) ..........................................................................25

*Heinsohn v. Carabin & Shaw, P.C.*,
    832 F.3d 224 (5th Cir. 2016) ........................................................ 20, 28, 29, 34

*Henry v. CorpCar Servs. Houston, Ltd.*,
    625 Fed. Appx. 607 (5th Cir. 2015)..............................................................21

*Hernandez v. Yellow Transp., Inc.*,
    670 F.3d 644 (5th Cir. 2012) ..........................................................................20

*Johnson v. PRIDE Industries, Inc.*,
    7 F.4th 392 (5th Cir. 2021) ........................................................... 20, 23, 30

*Long v. Eastfield College*,
    88 F.3d 300 (5th Cir. 1996) ..........................................................................22

*McCoy v. City of Shreveport*,
    492 F.3d 551 (5th Cir. 2007) ..........................................................21

*Oncale v. Sundowner Offshore Servs.*,
    523 U.S. 75 (1998)..........................................................................21

*Porter v. Houma Terrebonne Hous. Auth. Bd. of Com'rs*,
    810 F.3d 940 (5th Cir. 2015) .........................................................31

*Satterfield and Pontikes Constr., Inc. v. United States Fire Ins. Co.*,
    898 F.3d 574 (5th Cir. 2018) .........................................................19

*Taylor v. Seton Healthcare*,
    2012 WL 13680 (W.D. Tex. 2012)...................................................27

*Tolan v. Cotton*,
    572 U.S. 650 (2014)................................................................. 19, 29

*Waltman v. Int'l Paper Co.*,
    875 F.2d 468 (5th Cir. 1989) .........................................................26

*Wilson v. Moulison North Corp.*,
    639 F.3d 1 (1st Cir. 2011)...............................................................27

*Woods v. Cantrell*,
    29 F.4th 284 (5th Cir. 2022)............................................... 18, 21, 23

*Zamora v. City of Houston*,
    798 F.3d 326 (5th Cir. 2015) .........................................................32

**Statutes**

Article III of the United States Constitution...............................................1

28 U.S.C. §§ 1343(a)(4).............................................................................1

28 U.S.C. §§ 1343(a)(3).............................................................................1

28 U.S.C. § 1367 ......................................................................................1

29 U.S.C. § 1291 ................................................................................1

42 U.S.C. §§ 1981 ..............................................................................3

42 U.S.C. §§ 2000e ........................................................................1, 3

42 U.S.C. § 1981 ................................................................................1

Tex. Lab. Code §§ 22.001 ..................................................................3

**Rules**

Fed. R. Civ. P. 56(a) .........................................................................18

## I.     JURISDICTIONAL STATEMENT

Brittany Hudson ("Plaintiff" or "Hudson") appeals from the February 2, 2022, Order and Final Judgment issued by the District Court granting Lincare Inc.'s, ("Defendant" or "Lincare") Motion for Summary Judgment.  The District Court had jurisdiction under 28 U.S.C. § 1331, which confers original jurisdiction upon District Courts for actions arising under the laws of the United States, and under 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), which confers original jurisdiction upon District Courts in a civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights including (i) 42 U.S.C. §§ 2000e *et seq.,* as amended, and (ii) 42 U.S.C. 1981 *et seq.,* as amended.  The District Court also had jurisdiction over this action under 28 U.S.C. § 1367, which confers supplemental jurisdiction for all other claims that are so related to a claim in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

Plaintiff timely filed a Notice of Appeal, dated March 3, 2022, that was entered by the Court on March 3, 2022.  This Court has jurisdiction over this appeal under 29 U.S.C. § 1291.

1

## II.    STATEMENT OF THE ISSUES PRESENTED

1.    Did the District court err when it held that "under the law of this Circuit, more is required to sustain a claim for hostile work environment" than four known uses of the "N-word" and other slurs in a supervisor's presence, including uses directed at Plaintiff?

2.    Did the District Court commit reversible error when it granted summary judgment to Defendant on Plaintiff's hostile workplace claim by deciding disputed issues of fact in favor of Defendant regarding the promptness and adequacy of its remedial measures?

3.    Did the District Court err when it granted summary judgment on Plaintiff's retaliation claim because the employees who retaliated were "not empowered to take tangible actions" against Plaintiff, where those employees' sabotage of Plaintiff's job performance made up the basis for the tangible actions taken against Plaintiff by their mutual supervisor, and evidence supports a finding that the supervisor was aware of the employees' sabotage?

## III.    STATEMENT OF THE CASE

### A.    Procedural History

Plaintiff filed suit against Defendant for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), the Civil Rights Act of 1866, as amended, 42 U.S.C. §§ 1981 *et seq.* ("§ 1981"), and the Texas Employment Discrimination Act, as amended, Tex. Lab. Code §§ 22.001 *et seq.* ("TLC").  Plaintiff brought claims for a hostile work environment, discrimination, retaliation, and breach of contract. (ROA.7-17). Defendant moved for summary judgment regarding all of Plaintiff's claims on October 14, 2021. (ROA.205).

The District Court granted Defendant's Motion for summary judgment on February 2, 2022. (ROA.1109-1127).  In granting summary judgment on Plaintiff's hostile work environment claim, the District Court found that there were four uses of the N-word[1] supported by the record, but still determined that "under the law of this Circuit, more is required to sustain a claim for hostile work environment." (ROA.1118-1119).

---

[1] The term "'n****r' is a universally recognized opprobrium, stigmatizing African Americans because of their race." *Brown v. E. Miss. Elec. Power Ass'n.*, 989 F.2d 858, 861 (5th Cir. 1993). "The n-word is pure anathema to African Americans, as it should be to everyone. Use of the n-word even in jest could be evidence of racial antipathy." *Carter v. Cali. Grill, LLC*, 2021 WL 1960629 at *6 (W.D. Tex. 2021) (internal citations and quotations omitted). Because this Court and the Parties well know the full spelling of the word and its full and terrible power and force as a weapon of racial antipathy, and because spelling the word out is unnecessary to any of the legal issues before this Court, in this brief counsel will either replace the letters with asterisks or refer to the word by its well-known euphemism "the N-word." The use of this euphemism is not intended to distract from the extreme dysphemism and hatred of the word itself.

3

Regarding Plaintiff's retaliation claim, the District Court found that Plaintiff's allegations regarding her co-worker's retaliation could not be imputed to Defendant, even though Defendant acted upon the employees' actions. (ROA.1121-1125). The District Court also found that Plaintiff failed to prove her co-workers knew of her complaints to Human Resources despite the submitted evidence to the contrary. (ROA.1121-1125).

## B.    Statement of Facts

### 1.    Plaintiff Begins Employment at Defendant's Austin Office

Plaintiff, Brittany Hudson, is a Black woman who began her employment with Defendant in April 2015 in Astoria, Oregon as a sales representative for oxygen and respiratory equipment. (ROA.571-572).  In December 2018, Plaintiff transferred to Defendant's Austin office with the same position. (ROA.574-575;ROA.604).

When Plaintiff began her employment in Austin, Casey Greenway was the manager of the Austin office. (ROA.608). Ms. Greenway was Plaintiff's manager throughout her employment in Austin and Plaintiff reported directly to her. (*Id.*). Plaintiff and Adelle Boyd were the two sales representatives working out of the Austin office. (ROA.611). The customer service representatives ("CSRs") also reported directly to Ms. Greenway. (ROA.609).  There were three CSRs during Plaintiff's employment at Lincare's Austin location and Plaintiff specifically

remembers Patricia Ruiz and Anicia Torres as being employed as CSRs during the entirety of her tenure at the Austin office. (ROA.610).

When Plaintiff began her employment, Tina Avera was the area manager who covered the Austin office as well as other locations. (ROA.639). During Plaintiff's tenure, Ms. Avera left, and Mike Potter was the new area manager. (ROA.661-662). Juanita Lichtenberg was one of the Human Resources business partners for Defendant, and her responsibilities included assisting managers and employees with any issues they were having. (ROA.809).

Plaintiff was the only Black woman in the office.  Casey Greenway, Patricia Ruiz, and Adelle Boyd are all White. (ROA.611). Anicia Torres is Hispanic. (ROA.869)

## 2.    The Austin Office is a Racially Hostile Work Environment

Racially hostile treatment began soon after Plaintiff began her employment in Defendant's Austin office.  During a sales meeting, area manager Tina Avera told Plaintiff that she needed to do something with her hair and that she needed to dress better. (ROA.642). Ms. Avera told Plaintiff that she could speak to her like this because her daughter-in-law was Black. (ROA.642). Plaintiff was very uncomfortable and found this entire encounter very stressful. (ROA.643).

Plaintiff was the only Black woman in the office, yet Defendant allowed Ms. Torres to frequently use the N-word. (ROA.611;ROA.650;ROA.869). The first time

Plaintiff witnessed Ms. Torres use the N-word was in a "Monday morning meeting and she said it and nobody in the meeting said anything," even though everybody from the Austin office was present at the meeting. (ROA.650-651;ROA.900). Plaintiff soon realized that the N-word was part of Ms. Torres "vernacular in the office," and it "wasn't a thing where you can count on your hands how many times she said it. She just said it all of the time." (ROA.650;ROA.656). Even though manager Ms. Greenway also witnessed Ms. Torres using the N-word, she would just tell her not to use that word. (ROA.777).[2]

Ms. Boyd, the other sales representative, informed Plaintiff that when she was not in the office, Ms. Ruiz and Ms. Torres would make racist remarks about her, including that she is "ghetto," and "loud and black." (ROA.657-658). This racist behavior continued and came to a climax at a team meeting in June 2019.

### a) The June 20, 2019 Meeting

On June 20, 2019, Plaintiff was told to come into the office for a team meeting. (ROA.664). When Plaintiff arrived for the meeting, she saw Ms. Boyd, Ms. Greenway, Mr. Ruiz and Ms. Torres in attendance. (ROA.666). Prior to this meeting, Ms. Boyd had complained to Mr. Potter (area manager) because Plaintiff and Ms.

---

[2] While Ms. Greenway claims that she put a note in Ms. Torres' file that Ms. Torres was counseled for using the N-word, this is disputed by (1) Ms. Lichtenberg who explained that written warnings need to come from Human Resources; and (2) the testimony that the later June 20th meeting and Ms. Torres' use of the n-word was her first offense and an "isolated event." (ROA.777;ROA.815).

Boyd were having problems with the CSRs getting their orders in the system and getting the information they needed in a timely manner. (ROA.668).

Ms. Greenway made clear that she did not like Ms. Boyd complaining to Mr. Potter, and if this happened again, "she will write them up and fire them." (ROA.667). The meeting then got very emotional and heated. (ROA.670-671). Ms. Greenway refused to step in and take control. (ROA.670-671). Plaintiff began to get up and leave the meeting, but Ms. Torres started yelling at her and explaining how she, Ms. Torres, is the best employee in the office. (ROA.673-674).

Plaintiff asked Ms. Torres to stop using the N-word in the office, and that Plaintiff had heard her use it several times and she would like her to stop. (ROA.674;ROA.885). It is undisputed that Ms. Torres responded by saying that she was going to say the N-word when she wants to say the N-word and that Plaintiff wasn't going to stop her. (ROA.674;ROA.885). Plaintiff claims that Ms. Torres got very heated and called Plaintiff a "'N' word, 'B' word." (ROA.676).

Q.    Okay. So she called you a n****r b***h?

A.    Yes.

(ROA.676).

Plaintiff was horrified; she did not feel safe and was afraid that Ms. Torres was going to try to physically attack or hurt her. (ROA.675;ROA.732). "And so it was just – at that moment I couldn't believe that my coworker called me the 'N'

7

word, you know, like to my face, and then told me that this is what she is going to keep saying." (ROA.674).

Plaintiff was even more disturbed by the fact that the manager in the room, Ms. Greenway, failed to take any action and merely said "everybody needs to speak nice to each other and with respect." (ROA.675). Indeed, Ms. Greenway's account of the meeting is that "there was a name called," and then "Plaintiff was aggressive" and "got in Anicia's face and told her not to say certain words." (ROA.776;ROA777). Ms. Torres then walked out of the meeting and Plaintiff followed shortly thereafter. (ROA.676). After this meeting, Ms. Greenway told Plaintiff that "everybody needs to get over it. It happened. Move on." (ROA.677).

### 3.    Plaintiff Submits a Complaint to Human Resources

Upon realizing that Ms. Greenway was not going to address the racially hostile environment, Plaintiff made a report to Human Resources. (ROA.677-678). Plaintiff emailed Human Resources and was put in touch with Juanita Lichtenberg at Defendant's corporate office. (ROA.678). Plaintiff spoke with Ms. Lichtenberg and explained that Defendant's Austin office was a racially hostile work environment. (ROA.679;ROA.825). Not only did Plaintiff inform Ms. Lichtenberg of the racial slurs yelled at her during the June 20th meeting, but she also explained to Ms. Lichtenberg how racial slurs were part of Ms. Torres' regular vocabulary and

that Ms. Ruiz had previously called her ghetto, and big, black and loud. (ROA.826;ROA.892).

### 4.    Defendant Fails to Take Adequate Action Regarding the Racially Hostile Working Environment

Defendant never fully investigated the racially hostility that was happening at the Austin office. Even though it was reported that the N-word was used frequently in the office, Ms. Lichtenberg failed to investigate how often it was used or in what context. (ROA.825). Defendant never conducted an all-hands meeting at the Austin office where all the employees were counseled and instructed as to what was improper and harassing. (ROA.818). Ms. Lichtenberg did not visit the Austin office. (ROA.818). Nor was anybody told to apologize to Plaintiff. (ROA.820). Indeed, when Plaintiff arrived at the office the next day, she was instructed again by Ms. Greenway to not talk about what happened and "just keep going like nothing happened." (ROA.680).

Defendant does not deny that Ms. Torres used racial slurs in this meeting, or that she called Plaintiff a "B-word." (ROA.894). Defendant now denies that Ms. Torres called Plaintiff a "N-word, B-word." (ROA.894). However, this a disputed fact and is contradicted by both Plaintiff's testimony and Defendant's own evidence.

Plaintiff testified that she was called a "N-word, B-word." (ROA.676). The original ticket regarding this incident originated by Defendant's own system was titled: "<u>Brittany Hudson is called a racial slur during a team meeting</u>" before it was

changed by Ms. Lichtenberg to "Brittany Hudson, Austin TX, complained of a racial slur during team meeting." (ROA.823;ROA.899) (emphasis added). Finally, the notes originated by Defendant from the initial call into Human Resources stated that "the customer service rep called her the N\*\*ger and B\*\*ch repeatedly during the meeting. The manager Casey Greenway did not try to redirect the CSR from calling her these names during the meeting. She is requesting that someone in HR look into this matter. This was not the first time that a CSR and the Manager have heard these words being [sic] used during a team meeting." (ROA.900) (emphasis added). Despite the conflicts in Defendant's own evidence, Defendant does not dispute that Ms. Torres called Plaintiff a "B\*\*ch" for bringing up Ms. Torres' use of the N-word, nor that Ms. Torres told Plaintiff that she would use the N-word whenever she wanted to." (ROA.211).

Ms. Greenway testified that Ms. Lichtenberg gave her written warnings to issue to both Ms. Torres and Ms. Ruiz, and that she counseled them and issued these warnings to them on June 25, 2019 (ROA.785). The unsigned versions of the warnings produced by Defendant state that any future incidents or any violation of the policy prohibiting retaliation would result in their immediate termination. (ROA.786;ROA.936-937;ROA.938-939). However, Defendant never produced signed copies of these final warnings. Ms. Torres does not remember getting one or ever signing one. (ROA.868; ROA.870). Nor does Ms. Torres remember ever being

counseled by Ms. Greenway for using racial slurs. (ROA.869). Ms. Ruiz testified

that she refused to sign hers. (ROA.920). Yet, Ms. Lichtenberg claims that there are

signed copies for both final warnings: "they did sign them." (ROA.830). In light of

Ms. Torres' testimony that she does not remember being warned and Defendant's

failure to produce a signed warning, a reasonable jury could conclude, and the

District Court at summary judgment should assume, that no warning was actually

issued, at least to Ms. Torres. But regardless of what was issued on paper, it was not

followed through upon in practice.

### 5.     Plaintiff is Retaliated Against

While both Ms. Ruiz and Ms. Torres were hostile to Plaintiff before this

incident, after Plaintiff's complaint they both refused to service her accounts.

(ROA.686). Ms. Boyd had informed Ms. Lichtenberg that she overheard Ms. Ruiz

saying that she and Ms. Torres were not going to process Plaintiff's orders because

they "don't like her." (ROA.832;ROA.887). Ms. Boyd specifically informed Ms.

Lichtenberg that Ms. Ruiz and Ms. Torres were sabotaging Plaintiff by deleting

information off Defendant's system and had even referred some customers to one of

Defendant's competitors. (ROA.888).

The sales representatives, such as Plaintiff, need CSR support both before and

after making sales and having the CSRs properly do their job (and not intentionally

sabotage her work) was necessary for Plaintiff to do her job. (ROA.686). The CSRs

are the sales representatives' contact; their job duties include answering the phone and checking the computers on a consistent basis to make sure the sales representatives in the field have what they need. (ROA.699).

Yet, even though on June 24, 2019, Ms. Boyd had reported to Ms. Lichtenberg in writing that the CSRs were refusing to assist Plaintiff, making it impossible for her to successfully do her job, Ms. Lichtenberg admits that she cannot remember if she ever investigated it, nor are there any records indicating an investigation ever occurred. (ROA.887;ROA.787). Instead of addressing Plaintiff's complaints that her work was being sabotaged by the CSRs in retaliation for her prior complaint about their racially hostile language and behavior, shortly after Plaintiff submitted her complaint to Human Resources, in July 2019, Defendant put *Plaintiff* on an action plan. (ROA.787). Putting Plaintiff on a 'formal action plan' meant she was on a final warning and could be terminated at any time. (ROA.831)

### 6.    Plaintiff is Called Another Racial Slur and Defendant Fails to Take Appropriate Remedial Action

Ms. Torres' and Ms. Ruiz's alleged final warnings, which Plaintiff had never seen, specified that if there was another report of offensive language they would be terminated. (ROA.828). However, after these warnings were allegedly issued, Plaintiff learned of and reported another incident in which Ms. Ruiz referred to Plaintiff as Aunt Jemima. (ROA.657). Plaintiff heard about this comment from her co-worker, Scott Gove, who was employed at the Austin office as a health care

specialist. (ROA.659; ROA.821). It is undisputed that Plaintiff heard about this comment <u>after</u> the meeting where she complained about the N-word and reported it to Ms. Lichtenberg in Human Resources <u>after</u> she had reported the racial slurs during the June 20, 2019 meeting. (ROA.660-661;ROA.711) (emphasis added).

On July 5, 2019, Plaintiff submitted a complaint to Ms. Lichtenberg reporting that her co-workers were still racially harassing her and referring to her as Aunt Jemima. (ROA.713;ROA.828;ROA.905). Plaintiff informed Ms. Lichtenberg that this was "really traumatizing, emotionally stressful, and disturbing" and that she did not know how to handle it so she was reporting it to HR. (ROA.905). On July 8, 2019, Ms. Lichtenberg responded to Plaintiff and informed her that she was investigating it. (ROA.713). Indeed, on the same day Ms. Lichtenberg asked Mr. Gove if he had heard inappropriate conduct in the office <u>last week</u>, which would have been the first week in July, well after the June 20th meeting or June 25th final warnings. (ROA.828;ROA.890) (emphasis added). Mr. Gove confirmed that that the Aunt Jemima comment was made and that it was inappropriate and reported to her that he heard it "last week." (ROA.828;ROA.890;ROA.903). Mr. Gove further informed Ms. Lichtenberg that the FEDEX delivery man heard the comment, whoever was working in the front heard the comment, and that he even reported it to Ms. Greenway. (ROA.889).

However, Ms. Lichtenberg took no further action. She did not inquire as to why Ms. Ruiz made the comment and never even followed up with Ms. Greenway. (ROA.828). Nor does Defendant dispute that they failed to take any action regarding the racially hostile "Aunt Jemima" comment that was reported and alleged to have occurred after Defendant claims that Ms. Ruiz was issued a zero-tolerance final written warning. (ROA.829).

Defendant's reasons for why this comment did not result in any action by Defendant is muddled with inconsistencies. Ms. Lichtenberg never even spoke to Ms. Ruiz, yet claims it was because she could not determine when the comment was made. (ROA.828). Ms. Lichtenberg admits that even if Defendant disputes that it was made before Ms. Ruiz was given her final warning, it was made after the June 20th meeting. (ROA.828). Yet, Ms. Greenway claims that the Aunt Jemima comment occurred sometime in February or March. (ROA.918). Ms. Lichtenberg has conceded that "there could have been further investigation." (ROA.831). Indeed, Ms. Lichtenberg did not even bother to close out or ultimately respond to Plaintiff's July 8th complaint in Defendant's HR system until August 9, 2019 – a full month after the complaint and the same day Plaintiff resigned. (ROA.902).

### 7.    The Hostile Work Environment and Retaliation Continue Until Plaintiff Has to Resign

After continuing to endure a racially hostile work environment; complaining to Human Resources repeatedly and nothing changing; and also having the CSRs refuse to service her accounts thereby causing her to be put on a performance plan, Plaintiff resigned on August 9, 2019. (ROA.709;ROA.909). Plaintiff had been able to secure a position with another employer and was able to leave.

Plaintiff explained that the ongoing "racial harassment and hostile work environment has made it impossible for me to work here and perform my job duties." (ROA.909). Plaintiff further explained that the hostile work environment has caused her anxiety, depression, stress and has forced her to seek counseling. (ROA.909).

When Ms. Lichtenberg called Plaintiff after her discharge, Plaintiff explained that she "didn't understand how to fix the situation when I keep telling you how bad I am being treated and it's causing me emotional trauma and stress." (ROA.716). "I ke[pt] asking for help, and asking for help," and nobody was fixing it. (ROA.716). After Plaintiff complained about being called a "N-word, B-word," she was told to forget about it and never saw Defendant take any action.  Days later Plaintiff was called Aunt Jemima and again never saw Defendant take any action.  Plaintiff was in therapy for the emotional trauma of her work environment, and even today talking about it makes her anxious and nervous. (ROA.733). Plaintiff has even discussed

suicidal thoughts with her therapist that she never suffered from prior to her employment with Defendant. (ROA.734).

## IV.   SUMMARY OF THE ARGUMENT

The evidence and testimony of record raises critical issues of material fact regarding both Plaintiff's hostile work environment and retaliation claims which preclude summary judgment in Defendant's favor. The disputable questions of material fact that were impermissibly resolved by the District Court in Defendant's favor include:

- Whether Ms. Torres called Plaintiff a N-word B-word during the June 20th meeting. (ROA.1119).[3]

- Whether Ms. Ruiz and Ms. Torres were issued final, signed, written warnings after the incident on June 20th. (ROA.1112).

- Whether Ms. Torres using the N-word on June 20th was her first documented offense. (ROA.1112).

- Whether Ms. Ruiz referred to Plaintiff as Aunt Jemima after she received a final warning. (ROA.1120-1121; ROA.1123).

Plaintiff submitted testimony and evidence, corroborated by Defendant's own records, that Defendant's workplace allowed racial slurs, and that Plaintiff was called a "N-word B-word" in front of her entire office without her supervisor taking any action besides telling everybody in the meeting to be respectful. Indeed, when Plaintiff asked her co-worker to stop using racial slurs, the supervisor criticized

---

[3] The District Court reasoned that multiple uses of the n-word "not directed at a plaintiff" is not enough under the law of this Circuit to sustain a hostile work environment claim. Thus, the District Court disregarded Plaintiff's credible evidence that she was called a "N-word B-word" racial slur "directed to her" by her colleague in a meeting in front of her entire office.

Plaintiff for being "aggressive." The District Court erred in holding that Plaintiff's evidence was not enough to for an actionable hostile work environment in this Circuit. In fact, this Court has recently held that one racial slur spoken to a plaintiff by his supervisor can be sufficient to state an actionable claim for a hostile work environment. *See Woods v. Cantrell*, 29 F.4th 284 (5th Cir. 2022).

Nor did Defendant take adequate remedial action to stop the racial hostility. Defendant failed to properly investigate what happened and failed to stop it from happening again. Within days, Plaintiff was called another racial slur by one of the employees who was on an alleged "final warning" for previous actions against Plaintiff. Indeed, after Plaintiff was called Aunt Jemima and submitted another complaint to Human Resources, Defendant failed to conduct any meaningful investigation, and admitted in deposition that they should have done more. There is ample evidence of a hostile work environment that requires Plaintiff's claims to be decided by a jury.

The District Court concluded that because the employees who retaliated against Plaintiff by directly sabotaging her ability to do her sales job were not "empowered to take tangible action" against Plaintiff, their actions could not support a retaliation claim. But that retaliatory sabotage made up the basis for an "Action Plan" imposed by Plaintiff's supervisor, who was so empowered, and who a reasonable jury could conclude was aware of the sabotage.

18

## V.    ARGUMENT

### A.    Applicable Legal Standards

#### 1.    This Court's Standard of Review

This Court reviews an award of summary judgment *de novo* and thus applies "the same standard as the district court." *Satterfield and Pontikes Constr., Inc. v. United States Fire Ins. Co.*, 898 F.3d 574, 578 (5th Cir. 2018) (citing *Cooper Indus., Ltd. v. Nat'l Union Fire Ins. Co.*, 876 F.3d 119, 127-28 (5th Cir. 2017)). This Court must only uphold the district court's grant of summary judgment if it finds that Defendant has shown "that there is no genuine dispute as to any material fact." FED. R. CIV. P. 56(a). "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." *Burrell v. Dr. Pepper/Seven Up Bottling Group, Inc.*, 482 F.3d 408, 411 (5th Cir. 2007) (citing *Hamilton v. Segue Software Inc.*, 232 F.3d 473, 477 (5th Cir. 2000)).

It is a fundamental principle that on a summary judgment motion the court "may not resolve genuine issues of material fact in favor of the party seeking summary judgment," and that "reasonable inferences should be drawn in favor of the nonmoving party." *Tolan v. Cotton*, 572 U.S. 650, 656, 660 (2014). Nor may the court make credibility determinations or weigh any evidence, and most importantly, the court "must disregard all evidence favorable to the moving party

that the jury is not required to believe." *Chambers v. Sears Roebuck and Co.*, 428 Fed.Appx. 400, 407 (5th Cir. 2011) (citing *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010)). Indeed, "a nonmovant's statement may not be rejected merely because it is not supported by the movant's . . . divergent statements." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016).

### 2.    Plaintiff's Hostile Work Environment Claim under Title VII

To prove a *prima facie* case of a racially hostile work environment, Plaintiff must set forth that (1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Johnson v. PRIDE Industries, Inc.*, 7 F.4th 392, 400 (5th Cir. 2021); *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012). Conduct affects a term, condition or privilege of employment when is sufficiently severe or persuasive to create a hostile work environment. *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 474, 479 (5th Cir. 2008). Whether a claim establishes conduct sufficiently "severe or persuasive" depends on the totality of the circumstances. *Donaldson v. CDB Inc.*, 335 Fed. Appx. 494, 503 (5th Cir. 2009).

The totality-of-the-circumstances inquiry relies on "[c]ommon sense[ ] and an appropriate sensitivity to social context." *Henry v. CorpCar Servs. Houston, Ltd.*,

625 Fed. Appx. 607, 611 (5th Cir. 2015) (citing *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 82 (1998)). "To get past summary judgment, [plaintiff] need not make it 'clear' that she was subject to actionable harassment; she of course only needs to show that a jury could reach that conclusion based on its view of the evidence." *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 320, 325 (5th Cir. 2019). One instance of being called a racial slur in the workplace can be sufficient to state an actionable claim of hostile work environment. *Woods v. Cantrell*, 29 F.4th 284, 285 (5th Cir. 2022) (reversing and remanding grant of dismissal of plaintiff's hostile work environment claim and finding that one instance of being called a "Lazy Monkey A__ N__" was sufficient to plead a hostile work environment claim).

### 3.    Plaintiff's Retaliation Claim under Title VII

To establish a prima facie case of retaliation, Plaintiff must prove: (1) she engaged in protected activity; (2) suffered an adverse employment action; and (3) a causal link exists between the two. *See McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007). Once this is met, the burden shifts to the defendant to demonstrate a legitimate, non-retaliatory purpose for the employment action. *Id.* If the defendant satisfies this burden, the plaintiff must then establish that the employer's reason for the adverse action was merely a pretext for the real, retaliatory purpose. *Id.* In order to avoid summary judgment, the plaintiff must show "a conflict in substantial evidence" on the question of whether the employer would not have

taken the action 'but for' the protected activity. *Long v. Eastfield College*, 88 F.3d 300, 308 (5th Cir. 1996).

### B.    The District Court Erred in Granting Summary Judgment on Plaintiff's Hostile Work Environment Claim

#### 1.    Repeated Racial Slurs are Sufficient to Create Questions of Fact Regarding Plaintiff's Hostile Work Environment Claim

The District Court erroneously found that while it was undisputed that there were four uses of the N-word that "under the law of this Circuit, more is required to sustain a claim for hostile work environment." (ROA.1119). Plaintiff's evidence, taken as true on a summary judgment motion, is that her co-worker was allowed to repeatedly use the N-word in the office; when Plaintiff asked her to stop using the racial slur, her co-worker called her a "N-word, B-word" and her supervisor in the room failed to take any action; after Plaintiff complained to Human Resources about this incident, her co-workers stopped supporting her work, which left her unable to do her job and then continued to racially harass her, including referring to her as "Aunt Jemima" without any repercussion. (ROA.650;ROA.656;ROA.642; ROA.676; ROA.675;ROA.826:ROA.892;ROA.887). Under the law of this Circuit, this evidence is sufficient to create a genuine issue of material fact regarding whether Plaintiff was subjected to an unlawful hostile working environment.

This Court has previously recognized that the N-word is "the most noxious racial epithet in the contemporary American lexicon." *Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 401 (5th Cir. 2021) (quoting *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 387, 409 (5th Cir. 2005) (internal citations omitted)). While the District Court found that the mere utterance of an offensive term is insufficient to support a hostile work environment, the Supreme Court has recognized that far from a "mere offensive utterance" the N-word is "inherently and deeply humiliating." *Johnson*, 7 F.4th at 401) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Indeed, this Court recently clarified that a <u>single</u> instance of being called a racial slur by a supervisor can be sufficient to state a hostile work environment claim. *Woods v. Cantrell*, 29 F.4th 284, 285-86 (5th Cir. March 24, 2022) (finding that Plaintiff's allegation that his supervisor called him a 'Lazy Monkey A____ N____" in front of his fellow employees – states an actionable claim of hostile work environment.") (emphasis added).  The Court recognized that N-word is the "most offensive word in English" and sums up "all the bitter years of insult and struggle in America, [a] pure anathema to African Americans, [and] probably the most offensive word in English." *Id.* (quoting *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (arguing that a plaintiff being called the N-word by his supervisor "suffices by itself to establish a racially hostile work environment.").

23

Plaintiff was called a "N-word, B-word[4]" by her co-worker while her supervisor Ms. Greenway was present and refused to take any action besides placing blame on everybody in the room, including Plaintiff. (ROA.675). The racial slur was condoned by Ms. Greenway and in context may as well have come out of her mouth, especially given the effect on Plaintiff, who testified that she was just as horrified that Ms. Greenway did nothing about the racial slur yelled at her by Ms. Torres. (ROA.675). The evidence submitted by Plaintiff establishes, for summary judgment purposes, that her supervisor had heard her co-worker previously use the racial slur and refused to take any action, and again refused to do anything when Plaintiff was called a "N-word, B-word" in front of her entire office in a team meeting. Indeed, when testifying about this incident, Ms. Greenway referred to it as "there was a name called" and described Plaintiff's reaction as "aggressive." (ROA.776; ROA.777). Under the law of this Circuit, the District Court erred in finding Plaintiff's evidence insufficient to state a claim for a hostile work environment.

---

[4] Although Defendant now denies that this slur was directed to Plaintiff during the June 20th meeting, all evidence must be construed in Plaintiff's favor, notwithstanding that even Defendant's own evidence supports Plaintiff's claim. *See supra* at p. 9-10; (ROA.900;ROA.823;ROA.899).

**2.     The District Erred by Resolving Disputed Questions of Fact Regarding the Alleged Remedial Action in Defendant's Favor**

The District Court also erred in finding that Defendant's remedial actions in response to Plaintiff's complaint were sufficient. The Court erroneously resolved questions of fact in determining that (1) Defendant properly took sufficient "prompt remedial action when Greenway and Lichtenberg initiated an investigation, interviewed employees involved, and issued final written warnings to Torres and Ruiz." (ROA.1120); and (2) Defendant satisfactorily investigated the July 5th report of additional racial harassment (ROA.1120).

Prompt remedial actions "must be reasonably calculated to end the harassment," and if they are not, a Defendant may be held liable despite evidence of some response. *Harvill v. Westward Comm. L.L.C.*, 433 F.3d 428, 437 (5th Cir. 2005). The Defendant's response and investigation was not reasonably calculated to end the harassment and was insufficient to address what happened during the June 20th meeting as well as the racially hostile conduct that had preceded it. Defendant's remedial actions also failed to stop Plaintiff's co-workers from continuing to harass her. Indeed, Ms. Torres testified that she did not even recall any remedial action or warning after her use of the "N-Word" in the June 20th meeting.

Defendant never addressed the incident in a future meeting; Plaintiff was never told what the repercussions were (if any) or given an apology; and even though

Plaintiff reported that the N-word was used frequently in the office, Ms. Lichtenberg failed to investigate at all how often racial slurs were used or in what context. (ROA.818;ROA.820;ROA.825). Instead, Plaintiff was repeatedly told to "just keep going like nothing happened." (ROA.680). Further, the claim that both Ms. Torres and Ms. Ruiz were issued final warnings is contradicted by the testimony that Ms. Torres does not remember anything about any final warning or counseling to stop saying the N-word, that Ms. Ruiz testified she refused to sign it, and by Defendant's failure to produce signed copies of the "final warnings." (ROA.868;ROA.870;ROA.920).

Plaintiff has submitted sufficient evidence that Defendant failed to take sufficient remedial action regarding the racial hostility to which Plaintiff was subjected. "Not every response by an employer will be sufficient to discharge its legal duty. Rather, the employer may be liable despite having taken remedial steps" if they are not calculated to stop the harassment. *See Waltman v. Int'l Paper Co.*, 875 F.2d 468, 479 (5th Cir. 1989) (finding that defendant had a duty to take steps "reasonably calculated to halt the harassment" and although a jury after full trial may find that defendant did so, defendant was not entitled to summary judgment given the questions of fact). Certainly, the evidence that Plaintiff was called another racial slur within days is further proof that Defendant is not entitled to summary judgment on this issue. *See Carter v. California Grill*, 538 F.Supp.3d 714, 724 (W.D. Tex.

2021) (denying summary judgment and stating that harassment that continues after a defendant's remedial action creates a fact issue as to whether a defendant took sufficient remedial action); *Taylor v. Seton Healthcare*, 2012 WL 13680 at *18 (W.D. Tex. 2012) (holding summary judgment was inappropriate where plaintiff had submitted evidence that the harassment did not cease after the remedial action).

The District Court improperly weighed the evidence in Defendant's favor in determining that Plaintiff "presents no evidence to establish that her coworkers made any comments after receiving disciplinary action." (ROA.1122-1123). Even recognizing the dispute in the record as to the exact day the "Aunt Jemima" comment occurred, the District Court improperly determined that it could not have occurred after June 25, 2019. (ROA.1122-1123). This overlooks the evidence in the record supporting the critical factual dispute as to whether the comment occurred after the June 25th final warnings.

Plaintiff learned that Ms. Ruiz had called her Aunt Jemima[5] and reported it to Ms. Lichtenberg on July 5, 2019 – two weeks after the June 20th meeting where she was called a "N-word, B-word," and within days of Ms. Ruiz allegedly being issued a final warning (ROA.713;ROA.828;ROA.905). Plaintiff informed Ms. Lichtenberg

---

[5] The term "Aunt Jemima" is reasonably regarded as a racial slur. *See e.g. Wilson v. Moulison North Corp.*, 639 F.3d 1, 4 (1st Cir. 2011) (finding that employee calling plaintiff Aunt Jemima was "reasonably regarded as a racial slur"); *see also Bourger v. Eaton Corp.*, 114 F.Supp.2d 412, 416 (W.D. N. C. 2000) (recognizing that being called "Aunt Jemima" is evidence of racial animus).

that this was "really traumatizing, emotionally stressful, and disturbing" and that she did not know how to handle it so was reporting it to Human Resources so they could address it so it stopped. (ROA.905). On July 8, 2019, Ms. Lichtenberg responded to Plaintiff and informed her that she was investigating it. (ROA.713).

Even though Ms. Lichtenberg was able to confirm that the comment was made, and Mr. Gove confirmed on July 8th that he heard it "last week," (meaning after the June 25th alleged 'final warnings'), Ms. Lichtenberg refused to take any further action. She never spoke to Ms. Ruiz, who was reported to have made the comment. (ROA.889). She never followed up with anybody else who heard the comment. (ROA.828). She never questioned Ms. Greenway, who Mr. Gove reported the comment to. (ROA.903). Plainly speaking, Ms. Lichtenberg did nothing. In fact, Ms. Lichtenberg did not even bother to ultimately respond to Plaintiff's July 8th complaint until a month later after Plaintiff was forced to leave her employment. (ROA.902). Finally, she has since admitted that "there could have been further investigation." (ROA.902).

The District Court's resolving this issue of fact at the summary judgment stage constitutes reversible error. *See, e.g., Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016) (reversing and remanding district court's grant of summary judgment where district court "erred in rejecting [plaintiff's] statements as self-serving and accepting [defendants']" statements as true.); *Burton v. Freescale*

*Semiconductor, Inc.*, 798 F.3d 222, 236 (5th Cir. 2015) (reversing district court's grant of summary judgment on an ADA claim where district court improperly chose "which testimony to credit and which to discard"). *See also Tolan,* 572 U.S. at 651 (vacating grant of summary judgment and remanding for further proceedings where Fifth Circuit "failed to adhere to the axiom that in ruling on a motion for summary judgment, 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'"). Indeed, as this Court has explicitly warned, a trial court weighing evidence in an employment matter or disregarding the testimony and evidence of the employee while crediting the testimony and evidence of the employer would "render an employee's protections against discrimination meaningless." *Heinsohn*, 832 F.3d at 245.

Therefore, contrary to the District Court's finding, there are critical facts remaining regarding whether Defendant in fact took prompt remedial action. (ROA.1123). Nevertheless, it is undisputed that the "Aunt Jemima" comment was reported <u>after</u> the June 20th incident and <u>after</u> the June 25th final warnings. Defendant chose to avoid doing any meaningful investigation of Plaintiff's post-warning report of continued racially harassing comments. Plaintiff "didn't understand how to fix the situation" that was causing her "emotional trauma and stress." (ROA.716). "I keep asking for help, and asking for help." (ROA.716).

Defendant's refusal to take any action to stop the racially harassing conduct, including allowing her co-workers to continue to sabotage her work, creates a question of disputable fact as to whether Defendant took appropriate remedial action. *See e.g., Johnson*, 7 F.4th 392, 405-506 (finding that defendant's evidence of Human Resources employee interviewing employee over his alleged harassment not enough for summary judgment and the court has "no trouble concluding that [plaintiff] has created a genuine dispute of fact.").

### C. The District Court Erred in Granting Summary Judgment on Plaintiff's Retaliation Claim

The District Court erred in finding that Defendant's employees Ms. Ruiz's and Ms. Torres' refusal to service Plaintiff's accounts does not constitute retaliation because they were not "empowered to take tangible actions" against the Plaintiff. (ROA.1124). The District Court also erred in finding that Plaintiff failed to demonstrate a causal link between her reports to Lichtenberg and Ruiz's and Torres' actions because "Hudson's reports to Lichtenberg were confidential." (ROA.1125). Both these findings by the District Court are erroneous.

"Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses," and therefore, "[i]nterpreting the antiretaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's

primary objective depends." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S.Ct. 2405, 2414 (2006).

The Fifth Circuit has expounded on this by clarifying that "*Burlington Northern* requires us to consider the context of the alleged adverse employment actions, and emphasized that there are all manner of ways employers may retaliate against employees . . . ." *Porter v. Houma Terrebonne Hous. Auth. Bd. of Com'rs*, 810 F.3d 940, 947 (5th Cir. 2015). The Fifth Circuit has also interpreted *Burlington* to encompass a broad range of actions taken by employers as actionable retaliation. *See, e.g., Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 479-80 (5th Cir. 2008) (verbally harassing behavior from co-workers may be unlawful retaliation).

The District Court's reliance on *Brandon v. Sage Corp.*, is misplaced. 808 F.3d 266 (5th Cir. 2015). In *Brandon*, the court held that the Defendant could not be held liable for retaliation where an employee without power *threatened* to issue a pay cut that both never transpired and that the employee did not have the authority to institute. *Id.* at 272-273.

Here, Ms. Torres' and Ms. Ruiz's actions went well beyond mere threats. They had the power to sabotage Plaintiff's work, especially given that due to their sabotage, Defendant then took tangible action against Plaintiff by putting her on a performance plan, while knowing about Ms. Torres' and Ms. Ruiz's alleged retaliatory actions and failing to investigate them. In fact, it is undisputed that

Plaintiff never had documented performance issues at the Austin office prior to the June 20th meeting and her complaints to Human Resources.

Defendant knew that both Ms. Ruiz and Ms. Torres were refusing to service Plaintiff's sales accounts – which was necessary for her to be able to do her job. (ROA.686;ROA.832;ROA.887;ROA.888). Even though Defendant was on notice that this was occurring, Defendant admits that they do not know if it was ever investigated. (ROA.787). The only action Defendant took was putting Plaintiff on an action plan in July 2019, the first step in terminating her employment. (ROA.787).

This Court has recognized a defendant is liable for retaliation, under the "cat's paw" analysis, where employees with retaliatory animus are able to "manipulate[] the decisionmaker into taking what appears to the decisionmaker to be a non-retaliatory action." *Zamora v. City of Houston*, 798 F.3d 326, 355 (5th Cir. 2015). However here, Ms. Greenway was not just manipulated, but she <u>chose</u> to ignore what was happening and what Ms. Hudson had reported to Ms. Lichtenberg in HR. Just as Ms. Greenway had looked the other way, not remedying the racially abusive language of Ms. Torres and Ms. Ruiz, thereby perpetuating a racially hostile environment, Ms. Greenway allowed the CSRs to conduct a retaliatory sabotage campaign against Plaintiff, refusing to process Plaintiff's orders, yet only and unfairly disciplining Plaintiff. Not only were Ms. Torres and Ms. Ruiz able to manipulate the situation, it cannot even be said that Ms. Greenway was innocently

manipulated. To the extent that Defendant's HR business partner Ms. Lichtenberg and office supervisor Ms. Greenway were actually aware of the retaliatory activities of Ms. Torres and Ms. Ruiz, as Plaintiff's evidence shows, the retaliatory animus flows to Defendant's decision to put Plaintiff on an action plan.

Thus, Ms. Ruiz and Ms. Torres were "empowered to take tangible actions against Plaintiff," because they were empowered to sabotage Plaintiff's work and Plaintiff's supervisor Ms. Greenway looked the other way on the CSRs' sabotage while taking the tangible action of putting Plaintiff on an action plan. Ms. Ruiz' and Ms. Torres' actions are therefore imputed to the Defendant because they played a role and had influence over the Defendants' action in putting Plaintiff on a performance plan. *See Haire v. Bd. of Sup'rs of Louisiana State Univ. Agric. & Mech. Coll.*, 719 F.3d 356, 366-67 (5th Cir. 2013) (reversing the district court's grant of summary judgment and holding that the employee's discriminatory animus is imputed to the defendant for the purpose of creating an issue of disputed fact).

The District Court thus erred in finding that Ms. Torres and Ms. Ruiz were not empowered to take tangible retaliatory actions against Plaintiff by ignoring the facts presented that Ms. Greenway took a tangible retaliatory action against Plaintiff both for her own retaliatory purposes and on the basis of allegedly insufficient performance that she knew resulted from Ms. Ruiz and Ms. Torres' retaliatory sabotage of Plaintiff's work.

Further, the District Court's finding that there can be no causal link between Plaintiff's complaint to Human Resources and Ms. Torres' and Ms. Ruiz' actions is not supported by the record – especially as Defendant claims that Ms. Torres and Ruiz were both given "final warnings" in response to Plaintiff's complaint and threatened with termination. The District Court's conclusion of fact that Ms. Torres and Ms. Ruiz did not know Plaintiff had complained about their behavior is improper and in tension with the District Court's conclusion on Plaintiff's hostile workplace claim that Defendant had taken reasonable remedial action against Ms. Ruiz and Ms. Torres. *See, e.g., Heinsohn v. Carabin & Shaw, P.C.,* 832 F.3d 224, 245 (5th Cir. 2016) (reversing and remanding district court's grant of summary judgment where district court "erred in rejecting [plaintiff's] statements as self-serving and accepting [defendants']" statements as true); *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 236 (5th Cir. 2015) (reversing district court's grant of summary judgment on an ADA claim where district court improperly chose "which testimony to credit and which to discard").

## VI.   CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that this Court reverse the District Court's grant of summary judgment and remand to the District Court for further proceedings consistent with this Court's order.

Respectfully Submitted,

/s/ Holt M. Lackey
Holt M. Lackey
Jennifer Jones Despins
8310-1 N. Capital of Texas Hwy
Suite 190
Austin, Texas 78731
Phone: (737) 808-2260
hlackey@equalrights.law

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 18, 2022, a true and correct copy of the foregoing Brief for Plaintiff-Appellant were served via electronic filing with the Clerk of Court and all registered ECF users.

Dated: May 18, 2022                    /s/ Holt M. Lackey
                                       Holt M. Lackey

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief has been prepared using 14-point, proportionately spaced, serif typeface, in Microsoft Word. Excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), this brief contains 7,756 words.

Respectfully Submitted,

/s/ Holt M. Lackey
Holt M. Lackey
Jennifer Jones Despins
8310-1 N. Capital of Texas Hwy
Suite 190
Austin, Texas 78731
Phone: (737) 808-2260
hlackey@equalrights.law